Filed 6/16/14  In re I.A. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re I.A., a Person Coming Under the Juvenile Court Law. | B250249 (Los Angeles County Super. Ct. No. CK98911) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.A. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant C.A.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant K.A.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

C.A. (mother) and K.A. (father) separately appeal the juvenile court's jurisdiction and disposition orders, contending substantial evidence did not support declaring their son I.A. a dependent pursuant to Welfare and Institutions Code section 300, subdivision (b)[1] or removing him from their custody pursuant to section 361, subdivision (c). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The section 300 petition at issue originated from an incident involving mother, father, and I.A. when they arrived by bus to the skid row area of downtown Los Angeles (L.A.) in the early morning of April 2, 2012. Prior to that, they had been living in a variety of homeless shelters, transitional housing, and hotels in San Francisco, and they traveled to L.A. because they were thinking of settling in L.A. At the time of the trip, I.A. was 11 months old.

When they arrived in L.A., they looked for a hotel, but they did not have much money and could not find an affordable one. When individuals approached mother on the street, father started to get "aggressive" and brandished a taser he had on him because he was "nervous" and "worried about gangsters." Mother went to a nearby hotel and asked security to call the police to have father taken to a mental hospital.

A Los Angeles police officer responded to the call. The officer reported seeing father chase mother down the street and punch her on the side of her face. Father denied hitting mother and believed she was running into the street, so he pulled her back onto the sidewalk, which he thought might have looked to officers like he had hit her. Mother claimed she was crossing the street to catch a bus to find a hotel, but father believed she was trying to commit suicide or get away from him. Father was arrested for spousal battery and jailed for 48 hours before being released. Immediately after his arrest, officers gave I.A. to mother and she walked off with him.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

Los Angeles County Department of Children and Family Services (DCFS) received a referral based on the incident, and although mother and father were reported to be homeless, mother was uncooperative and refused assistance to a shelter. DCFS "evaluated out" the referral because mother and I.A. were homeless.

Mother stayed with I.A. in a hotel that night, but because she could not find a shelter the next day, she went to the Los Angeles Police Department (LAPD) Metropolitan Detention Center looking for help and to find father. While there, she told an officer she wanted to surrender I.A. because she was homeless. The officer reported mother appeared to have mental health problems because she was constantly talking to herself. But at the time the officer did not think she was a danger to herself or others.

A social worker arrived at the detention center and interviewed mother. Mother was hostile and immediately began to argue with the social worker. She did not want to answer questions and demanded the social worker provide her with shelter. She denied she suffered from mental health problems and denied she wanted to surrender I.A., explaining instead she said those things to get help from the police quickly. She denied abusing or neglecting I.A. and she did not appreciate being interrogated about any abuse. She said she was only homeless and needed a place to stay, she could take care of I.A., and she wanted to find father. During this interaction, the social worker observed mother mumbling and making incoherent statements to herself when not being asked questions.

When asked about the domestic violence incident, mother denied it occurred and denied father had ever been violent with her or threatened to hurt her or I.A. She said father had schizophrenia and was nervous and afraid in L.A. She declined to go to a domestic violence clinic because father was not a threat to her and she wanted to be reunited with him.

The social worker transported mother and I.A. to a DCFS office to search for an emergency shelter for them, but was unable to find available space. Mother was impatient and argued with the social worker. Although mother agreed to an "upfront

assessment" (UFA), she became hostile and impatient and attempted to leave with I.A. before the UFA assessor arrived. The social worker convinced her to stay, but she walked out a second time after talking with the UFA assessor. Outside, the social worker observed her talking incoherently and acting bizarrely as she walked down the street with I.A. She appeared to be in a daze, hallucinating, or under the influence, carrying I.A. like a "rag doll." She had him in a chest harness but he was constantly crying and she did not appear to be aware of him and did not acknowledge his crying. The social worker believed I.A. to be at "**very high risk** to abuse and neglect" and determined mother "could not demonstrate any sense as to how she could appropriately care for her child."

Concerned for I.A.'s immediate safety, the social worker sought LAPD assistance and removed I.A. from mother. At the time, I.A. was dirty and had mild diaper rash, but he had no marks or injuries, and he appeared well-nourished and normal for his age. He did, however, cry constantly while awake and in his mother's arms. The social worker provided mother with his contact information, information about the detention hearing, and information on area shelters and hospitals.

The UFA assessor reported that during the interview with mother, she presented bizarre behavior and had difficulty answering questions. She had trouble with reality testing and was rarely mentally clear and present. She talked softly and seemed to have delusional thinking and paranoia, and she laughed inappropriately. At times she had difficulty comprehending or answering questions and seemed disoriented. She claimed she could "feel frequencies from the light or other things" but she "can't hear voices because in order to do that you would need a phone inside your brain." When the assessor asked one question, mother would answer a previously asked question and complain because the same question was asked twice. The assessor believed she was "very unstable and in need of an intensive psychiatric program to stabilize her" and "incapable to take care of herself" or I.A. Mother also reported that father suffered from schizophrenia, and she had an adult son and one sibling who suffered from mental illness.

4

Mother further admitted using alcohol for 22 years and marijuana for 23 years, and she said she had used marijuana two days before the UFA (the day they arrived in L.A.) when she smoked 10 marijuana cigarettes. She also said methamphetamines should be legal, and the assessor believed that could be a sign she may be using methamphetamines as well. The assessor was concerned mother was using marijuana and methamphetamines on a regular basis.

The assessor recommended in-patient psychiatric treatment, possible psychotropic medication, counseling, substance abuse programs, parenting classes, and in-home services.

The social worker placed I.A. in a foster home and filed the pending dependency petition on April 9, 2013. The petition alleged in count b-1 that mother had mental and emotional problems, including delusions and auditory hallucinations, and failed to obtain mental health services, which prevented her from caring for I.A. and put him at substantial risk of physical harm. In count b-2, the petition alleged mother had a history of substance abuse, currently used marijuana, and on prior occasions she had been under the influence of marijuana when caring for I.A., which endangered his physical health and safety.

On April 9, 2013, father was admitted to the Silver Lake Medical Center on a section 5150 hold.[2] An involuntary patient advisement indicated he was dangerous to himself and gravely disabled, meaning he could not provide for his own food, clothing,

_____

[2]    Section 5150, subdivision (a) states in relevant part, "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff, as defined by regulation, of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services. . . ."

or shelter. Father claimed he was admitted because he was suicidal, but he later denied he was actually suicidal, claiming instead he said that in order to get shelter, food, and clothing. He told the social worker he was hospitalized for a seizure. He was discharged 10 days later with medications to treat seizures and depression. Father's mother indicated he had previously been hospitalized in a psychiatric facility at least three times in South Carolina, Georgia, and California.

The juvenile court held a detention hearing on April 9, 2013, and neither mother nor father attended. The court found a prima facie case for detaining I.A. pursuant to section 300, subdivision (b) and set the petition for a hearing on May 31, 2013.

On April 13, 2013, mother admitted herself to a hospital and was placed on a 72-hour psychiatric hold. She was diagnosed with major depression, but was not prescribed any medication. She explained she was depressed because I.A. had been taken from her and if he were returned, she would no longer be depressed. Father said mother had been going through a deep depression because they had been homeless off and on since they had met in Georgia.

DCFS filed a combined jurisdiction/disposition report on May 21, 2013. In her interview for the report, mother denied she currently smoked marijuana, and said when she did smoke it, she had a medical marijuana card. Since the card expired, she stopped buying it. Father denied mother abused marijuana, and claimed she smoked it when she had her medical marijuana card because of her anxiety, but she does not smoke it anymore. Father said he wanted I.A. detained until the family had stable housing.

In its concluding assessment, DCFS noted the family was homeless and mother and father both had a history of severe and persistent mental illness, with neither parent taking medication or undertaking services for it. Both denied the need for mental health treatment, despite recent psychiatric hospitalizations. DCFS was also "gravely concerned" about the parents' ability to care for I.A. "given their denial and minimization of the events that caused detention." DCFS recommended I.A. be

6

suitably placed while the parents participate in parenting classes, obtain mental health treatment, and undergo assessment for substance abuse treatment.

On the day of the jurisdiction/disposition hearing, DCFS submitted a multidisciplinary assessment team report. It noted father was cooperative during the process and acknowledged the family did not have financial stability, so he was "adamant" he did not want to be reunified with I.A. if they had to live in a shelter. He claimed both he and mother were emotionally stable, although he was concerned about mother's depression over I.A.'s detainment.

While mother wanted to reunify with I.A., she was short with the assessor and vacillated between cooperation and hostility. She would make eye contact with the assessor and then would look down with her hands in her face, mumbling and humming to herself. She denied she had any mental condition and said she was depressed without her son. As the interview progressed, she became more angry and agitated, eventually becoming enraged when it became apparent she and father did not agree over the best course of action for I.A. She left the interview after 30 minutes and waited outside, interrupting father's interview twice to ask how much longer father planned to stay at DCFS.

In the end, the assessor believed mother and father had "many challenges at this time. They are homeless and have no financial means. [Father and mother] appear to minimize and/or deny their mental health issues. There also appears to have been past allegations of domestic violence and substance use for both parents."

The report also explained that, although I.A. was thriving in foster care, when he was first placed there he did not know how to move and did not crawl. Father admitted I.A. was in his stroller all day when they lived in San Francisco and he never had the opportunity to develop his gross motor skills. Further, the assessor observed a visit with the parents and I.A., during which I.A. lay flat on mother's lap drinking from a "sippy" cup while mother changed his diaper. Mother did not notice when I.A. became congested and he began to choke on his milk. Mother set him upright, but he was coughing and distressed. The assessor noted "very little engagement" between

mother and I.A. Mother held I.A. close to her chest, but did not talk to him or look in his eyes. She appeared to be uncomfortable when I.A. cried and became unhappy. Overall, during the visit I.A. had periods of calm, but he was also upset, crying, and appeared to be uncomfortable in mother's arms.

At the jurisdiction/disposition hearing, mother and father testified. Mother stated she was not currently on any prescribed psychotropic medication and explained she was diagnosed with "major depression because my baby was taken away by taser." Before that, she had never been diagnosed with major depression or been prescribed psychotropic medication. She did not recall doing the UFA assessment and denied the statements contained in it about her substance use, including that she had been using alcohol for 22 years and marijuana for 23 years. Instead, she claimed she used marijuana for the first time when she was 36 or 37 years old, and only did so legally with her medical marijuana card, but after that she never bought any. She denied smoking 10 marijuana cigarettes in one day, claiming that would be "impossible." She also denied ever hearing voices or feeling anything from the lights.

As for the facts leading to the petition, mother explained her version of events beginning with their arrival to L.A. and ending with father being arrested, as recounted above. She denied ever having a "misunderstanding" with father when he thought she was running into the street and he stopped her. She also denied telling a police officer she wanted to surrender I.A. She explained she told him they needed "adequate food, shelter, and clothing when [she] walked into the police station, and [she] asked him to call a social worker for [her]." When she walked out of the police station, a "man" followed her (presumably the social worker) and she told him, "let me get some fresh air so I can think about what I'm going through." She claimed police officers pointed a taser at her and I.A., so she surrendered him.

Father also testified to the events leading to the petition, denying he hit mother while she was in the street. He stated he had a medical marijuana card and he used it to help his seizures, but since I.A. was born he cut back to be "there mentally to take care of the child." He did not recall the last time he used marijuana. He also

explained he was put on the section 5150 hold because he had little clothing and no shelter or food, so he called an ambulance and lied that he was suicidal.  At the time he testified, he was staying in a shelter where I.A. could live with him, and he planned to get an apartment with mother, get a job, eventually go back to school, and put I.A. through private school and college.

The juvenile court sustained the petition on both counts, removed I.A. from parental custody, and ordered reunification services for the parents.  For both parents, the court ordered parenting classes, psychiatric evaluation, and random drug testing, but declined to order drug rehabilitation so long as parents did not miss any tests and their levels of marijuana declined over 30 days.  The court also ordered DCFS to make best efforts to assist parents with housing.  Mother and father timely appealed.

## DISCUSSION

### 1.  *Standard of Review*

In reviewing the jurisdictional findings and the disposition of the dependency court, "we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  Thus, "[w]e do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]  The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

## 2. *Jurisdiction*

Mother, joined by father,[3] contends substantial evidence did not support the juvenile court's jurisdictional findings. "Under section 300, subdivision (b), the juvenile court may assert jurisdiction over a child when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness.' Thus, '[t]he three elements for jurisdiction under section 300, subdivision (b) are: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'" [Citation.]' [Citation.]" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124 (*John M.*).)

Further, "[a]lthough section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citation.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216 (*Christopher R.*).)

Substantial evidence supported the juvenile court's jurisdiction finding based on mother's mental health issues. Everyone who came in contact with her noted she

---

[3] California Rules of Court, rule 8.200(a)(5).

10

had mental problems. The police officer who interacted with her at the police station believed she had mental health issues because she was constantly talking to herself. The social worker who spoke with her observed her mumbling and making incoherent statements to herself when not being asked questions. When the social worker took her to the DCFS office, she became hostile and impatient, walking out twice. Perhaps most important, once outside the social worker observed her talking incoherently and acting bizarrely as she walked down the street with I.A. She appeared to be in a daze or hallucinating and unaware of I.A., carrying him like a "rag doll" as he constantly cried. Mother also checked herself into a hospital and was placed on a 72-hour psychiatric hold for major depression.

In the UFA report, the assessor noted mother's bizarre behavior and difficulty answering questions. She had trouble with reality testing and was rarely mentally clear and present. She exhibited delusional thinking and paranoia, talked softly, and laughed inappropriately. At times she had difficulty comprehending or answering questions and seemed disoriented. She claimed she could "feel frequencies from the light or other things" but she "can't hear voices because in order to do that you would need a phone inside your brain." When the assessor asked one question, mother would answer a previously asked question and complain because the same question was asked twice. The assessor believed she was "very unstable and in need of an intensive psychiatric program to stabilize her" and "incapable to take care of herself" or I.A.

The multidisciplinary assessment team report noted mother was short with the assessor and vacillated between cooperation and hostility. She would make eye contact with the assessor and then would look down with her hands in her face, mumbling and humming to herself. As the interview progressed, she became more angry and agitated and left after 30 minutes.

Mother's mental condition placed I.A. at substantial risk of physical harm. Most striking was the social worker's observation when mother left the DCFS office that she seemed unaware of I.A. as she carried him like a "rag doll" and he constantly cried. While mother and father lived in San Francisco, they kept I.A. in a stroller so he

did not know how to move or crawl. Further, the multidisciplinary assessment team assessor observed a visit between mother and I.A. after he was removed, during which mother failed to notice when I.A. became congested and began to choke on his milk. The assessor noted "very little engagement" between mother and I.A. and she appeared to be uncomfortable when I.A. cried and became unhappy. Despite these incidents, mother denied she had any mental issues, significantly reducing the possibility she would seek treatment if I.A. were in her custody.

Nor could mother have relied on father to care for I.A. He suffered from schizophrenia, and he was put on a section 5150 hospital hold because he was dangerous to himself and gravely disabled. He had also been hospitalized previously in a psychiatric facility.

Further, the incident giving rise to the petition in this case was likely exacerbated by both parents' mental health issues. With little or no apparent planning, mother and father arrived in L.A. with an 11-month-old baby in an area of the city that father believed was not safe. When they could not find shelter, the situation quickly unraveled, prompting mother to walk into the street, after which father hit her and she contacting the police to take him to a mental hospital. Then mother offered to surrender I.A. to the police. Under these circumstances, substantial evidence supported the juvenile court's exercise of jurisdiction based on mother's mental and emotional issues.

Substantial evidence also supported the juvenile court's jurisdiction finding based on mother's substance abuse. In the UFA report, mother reported using alcohol for 22 years and marijuana for 23 years, and she had smoked 10 marijuana cigarettes on April 2, 2013, the day the family arrived in L.A. Although she later denied these statements, the juvenile court was free to reject her denials and find her prior statements true. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 ["The trier of fact determines the credibility of witnesses, weighs the evidence, and resolves factual conflicts."].) Whatever the definition of "substance abuse" under the statute, 23 years

12

of substance use and smoking 10 marijuana cigarettes in one day surely satisfies it.[4] And she likely smoked the marijuana cigarettes in I.A.'s presence, given he was in her sole care after father was arrested and they spent the night in a hotel. In cases involving young children who are put at risk from the absence of adequate supervision, "'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm.'" (*Christopher R., supra*, 225 Cal.App.4th at p. 1219; see *Drake M., supra*, 211 Cal.App.4th at p. 767.) Thus, the evidence of mother's substance abuse supported the juvenile court's jurisdictional finding.

## 3. Disposition

Father, joined by mother, contends substantial evidence did not support the juvenile court's disposition order. Under section 361, subdivision (c)(1), "a dependent child may not be taken from the physical custody of the parents with whom the child resides at the time the petition was initiated unless the juvenile court finds by clear and convincing evidence '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there is no reasonable means by which the minor's physical health

---

[4] In *In re Drake M.* (2012) 211 Cal.App.4th 754, 766 (*Drake M.*), the court interpreted the term "substance abuse" in section 300 to require evidence sufficient to "(1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM-IV-TR [the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000)]," with criteria focusing on recurrent substance abuse causing various problems. (*Ibid.*) We agree with *Christopher R.*, however, that the "*Drake M.* formulation [is] a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b). But it is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court, and we are unwilling to accept [mother's] argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser." (*Christopher R., supra*, 225 Cal.App.4th at p. 1219.)

13

can be protected without removing the minor from the minor's parent's . . . physical custody.' (§ 361, subd. (c)(1).) 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. (§ 361, subd. (c)(1).)' [Citation.] '"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]' [Citation.]" (*John M., supra*, 212 Cal.App.4th at p. 1126.)

The facts recounted above provide prima facie evidence that I.A. could not safely remain with mother and father due to their mental health issues. In arguing otherwise, father analogizes to *In re Jamie M.* (1982) 134 Cal.App.3d 530 and *In re Matthew S.* (1996) 41 Cal.App.4th 1311, but both cases are distinguishable. In *Jamie M.*, the court found removal improper based on the mother's chronic schizophrenic illness manifested by paranoid delusions and history of hospitalization because her drug therapy was "very effective" in controlling her illness and her children had not been mistreated. (*Jamie M., supra*, at p. 537.) In *Matthew S.*, the court found insufficient risk of harm to exercise jurisdiction based on the mother's delusions because she voluntarily participated in extensive therapy and her children were healthy and expressed no fear of her (the majority, however, found jurisdiction appropriate due to a substantial risk of emotional harm). (*Matthew S., supra*, at pp. 1319-1320.)

Here, in contrast, mother had hallucinations and talked to herself, which at one point caused her to carry I.A. like a "rag doll" without acknowledging his constant crying. She also offered to surrender I.A. at the police station. Yet she refused to acknowledge she had any mental health issues, let alone submit to a regimen of treatment. Father was schizophrenic and mother thought his behavior on arrival in L.A. was serious enough that she called the police to take him to a mental hospital. He was later placed on a section 5150 hospital hold because he was dangerous to himself and gravely disabled. Like mother, father was not under any regular care for mental health problems at the time of disposition. These facts justified I.A.'s removal.

14

Father further contends mother's marijuana use alone was insufficient to support removal. (See, e.g., *Drake M., supra*, 211 Cal.App.4th at p. 764 ["[W]ithout more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found."].) But here there was more evidence than simply marijuana use -- the evidence showed mother used marijuana for 23 years and smoked 10 marijuana cigarettes on the day they arrived in L.A., likely while I.A. was in her care. That was sufficient to move this case beyond "mere usage" and justify I.A.'s removal. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451-453 [acknowledging that the "the mere use of marijuana by a parent will not support a finding of risk to minors," but finding principle inapplicable because father previously used marijuana illegally, he used it while his children were home, and his use had a negative effect on his demeanor toward the children].) Father attempts to discount mother's admission that she smoked 10 marijuana cigarettes on the day they arrived in L.A., given their travel time and the events that followed. But mother's claim was not so inherently improbable that the juvenile court could not have reasonably found it to be true. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149 [explaining that appellate courts "rarely reject evidence the trial court found credible" unless the evidence is """"wholly unacceptable to reasonable minds" [citation]; "unbelievable *per se*" [citation] such that "no reasonable person could believe the testimony""""].) Thus, mother's substance abuse further supported I.A.'s removal.[5]

Finally, father argues there were other reasonable means to protect I.A. short of removal, such as ordering drug testing, unannounced home visits, housing assistance, and play therapy for I.A. (See *In re Hailey T.* (2012) 212 Cal.App.4th 139, 148 ["[C]ourts have recognized that less drastic alternatives to removal may be available in a given case including returning a minor to parental custody under stringent conditions

---

[5]     Father also argues the juvenile court's removal order was not justified based on evidence of the parents' depression and the single incident of domestic violence when the family arrived in L.A. Yet, the DCFS did not allege those facts as grounds for removal and the juvenile court did not rely on them in issuing its dispositional order.

of supervision by the agency such as unannounced visits."].)  But none of these lesser measures would have addressed the parents' serious mental problems, which would have exposed I.A. to a substantial risk of harm if left in the parents' custody.[6]  Given that they refused to be treated for their mental health issues, I.A.'s removal was proper.

**DISPOSITION**

The trial court's jurisdictional and dispositional orders are affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

---

[6]    We also reject father's suggestion that the juvenile court removed I.A. because the family was homeless and lacked resources.  (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 ["[P]overty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction."].)  Nothing in the record suggests the court's orders rested on those grounds.